UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WAYNE BRENT and AMERICA'S MOST WANTED FOODS, LLC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:04CV266 CDP |
| ANNIE REDFEARN and JERRY REDFEARN, d/b/a/ REDFEARN FAMILY BLENDING, | ) ) ) ) | |
| Defendants. | ) ) | |

## **MEMORANDUM AND ORDER**

This case is about a chili mix business deal gone bad. Although the deal went bad, everyone agrees that the chili mix is good. Defendant Jerry Redfearn controlled the mix recipe and sold the spices. Plaintiff Wayne Brent paid Redfearn significant money to become a manufacturer and seller of the mix, but his business failed. The evidence at trial was hotly contested on almost all issues. Credibility of the two principals – Wayne Brent and Jerry Redfearn – was an important part of the trial. After a five-day trial, the jury awarded actual damages of over a million dollars for Brent's claims against Jerry Redfearn for fraud, breach of contract, tortious interference with business expectancy, and defamation. The jury also awarded $500,000 in punitive damages on the defamation claim. Redfearn now

seeks a new trial, but he raises no grounds that would entitle him to one, and so I will deny his motion for new trial. Additionally, I will grant Brent's requests for attorneys fees and costs.

## Background

America's Most Wanted Chili is a liquid chili mix packaged in a jar; the consumer simply adds the mix to meat or beans to make chili. All the witnesses agreed that the resulting chili tastes good and the product is easy to use. Jerry Redfearn developed the recipe. In the past, he had produced the finished mix, but by the time this case arose he had begun a new business of selling the spices and the right to manufacture and sell the finished mix. Redfearn advertised this new business opportunity in national publications.

Wayne Brent learned of the business opportunity and entered into various contracts with Redfearn. The general outlines of the arrangements were for Brent to buy the spices from Redfearn and manufacture and sell the mix. Until the Brent manufacturing facilities were up and running, Brent would buy the mix from another of Redfearn's manufacturers and would sell it in St. Louis and surrounding areas. After an aggressive marketing campaign, Brent's sales took off, and he had gotten the product placed in two major supermarket chains and in several smaller chains and stores. An extremely favorable article about Brent and the chili mix appeared in

the St. Louis Post Dispatch, and the St. Louis chili business was on the brink of success.

The same day the article appeared in the paper, Jerry Redfearn called the St. Louis Health Department and reported that Brent was selling outdated chili mix that had been produced and stored in unsanitary and unlicensed facilities. Although none of Redfearn's statements turned out to be true, the resulting investigation and embargo of Brent's product killed the business, and it was never able to recover.

I will not attempt to summarize in detail the evidence of the parties' relationship and the events leading up to the telephone call: doing so is next to impossible and is not really necessary for purposes of this motion. Suffice it to say that the evidence was confusing and conflicting. As stated above, the only point of agreement was that the chili mix was a good product. The parties presented conflicting versions of contracts, with copies (and originals) of what looked like the same agreement signed on different dates and by different entities; there were some contracts that supplemented previous ones, and some contracts that purported to supersede previous ones. The parties disagreed about who the parties to the contracts were, and presented conflicting evidence and arguments about the roles of Wayne Brent, America's Most Wanted Foods, LLC, Jerry Redfearn, Annie Redfearn, and Redfearn Family Blending. There were handwritten notations on

various contracts, and the parties disagreed not only about what the notations meant but also about what the notations actually said and whether they were placed on the contracts before they were signed, or afterward, or both. Witnesses provided entirely different descriptions about numerous conversations and meetings.

Although Brent prepared a manufacturing facility, purchased equipment and sent employees to food school, he never actually produced any mix. Although a couple of Texas sisters-in-law produced some chili mix that was delivered to Brent and sold by him, the ladies themselves gave conflicting or uncertain testimony about where they manufactured the mix, who owned the manufacturing facility, and exactly when the chili was produced. Substantial evidence regarding the difference between "acid" foods and "acidified" foods was presented, but there was no definitive evidence regarding which one the chili mix actually was. A non-doctor referred to as "Dr. Maneer" produced some chili mix and provided some comic relief for a trial that didn't really need any.

After subjecting the jury to five days of very conflicting evidence, we asked the jury to sort out the claims, and they did so. They found in favor of defendant Annie Redfearn on the only claim submitted against her. They found in favor of the plaintiffs and against defendant Jerry Redfearn on all the claims submitted against him. They assessed damages: for fraud in the amount of $411,250; for breach of

contract in the amount of $84,400; for tortious interference with business expectancy in the amount of $576,000; and for defamation actual damages of $100,000 and punitive damages of $500,000.

Both Jerry and Annie Redfearn have filed a motion for a new trial. They argue that the evidence was insufficient, or the verdict was against the great weight of the evidence, on all of the claims. They also argue that the fraud jury instructions were erroneous and that the punitive damages award shocks the conscience. Their counterclaim, on which I granted judgment as a matter of law at the close of the evidence, is not a subject of the motion for new trial. Although they argue that there was insufficient evidence to support the claims, they have not asked for judgment as a matter of law. Finally, I am not sure why Annie Redfearn wants a new trial, since she was not found liable for anything, and judgment in her favor was entered on all claims against her. In any event, I will review the motion under the standards for granting a new trial.

## **Discussion**

When a motion for new trial is based on an argument that the verdict is against the weight of the evidence, I may rely on my "own reading of the evidence and grant a new trial even where substantial evidence exists to support the verdict." <u>Dominium Management Services, Inc. v. Nationwide Housing Group</u>, 195 F.3d 358,

366 (8th Cir. 1999) (citing White v. Pence, 961 F.2d 776, 780 (8th Cir.1992)). The ultimate test is whether there has been a miscarriage of justice if the jury's verdict is allowed to stand. White, 961 F.2d at 780.

The evidence submitted here supported the jury's verdicts on all four counts, and there has been no miscarriage of justice. As I stated before, the credibility of the witnesses – especially of Jerry Redfearn and Wayne Brent – was a very important part of the trial. In my opinion, Jerry Redfearn was not at all credible, and the jury apparently reached the same conclusion as I did about his credibility. He was certainly interesting, and colorful, and I am sure he told the truth about a few things, but his general testimony was not credible. His testimony on certain crucial points – such as whether he had made statements about other licensees, why he sent a letter terminating a contract he claimed did not exist, whether he claimed the product was an acid food or an acidified food, and why he called the health department – sounded contrived, to say the least. He was one of those witnesses who seemed determined to have an explanation for everything, even if doing so resulted in some pretty farfetched explanations. Although there was evidence from which one could conclude that Wayne Brent had also been untruthful at times, his credibility was generally much better – his testimony usually made sense, his appearance while testifying seemed sincere, and his testimony was corroborated in

many respects by the documentary evidence and testimony of other witnesses.  The jury had an ample basis to credit the testimony of Brent over that of Redfearn on points where their testimony conflicted.

On the fraud count the jury was instructed on the elements of fraud under Missouri law.  The first element of fraud – that defendant made misrepresentations – listed three possible actionable representations.  They were that Redfearn had represented: (1) that other licensees of his products had been successful and that licenses had been successfully sold in other locations; (2) that the Kays' (the Texas sisters-in-law) manufacturing facilities were operational and that the products would be made at the Kays' facility in Houston; and (3) that the products would comply with applicable governmental regulations and would be useable in Brent's business.  The submissions were made in the disjunctive, so if the jury found Redfearn had made any of the three misrepresentations, and if the other elements were proved, the jury could find him liable.

Redfearn now argues that these alleged misrepresentations cannot be the basis for a claim of fraud, because they are mere statements of opinion or projections of success in the future.  This is simply incorrect.  The statements alleged were representations of fact, and were not mere puffing or predictions of success or profits in the future.  Additionally, there was ample evidence from which

the jury could find both that Redfearn made the statements and that they were false. Brent and others testified that Redfearn made the statements, and although he denied some of them, as stated above, it was entirely reasonable for the jury to discredit Redfearn's testimony. There was evidence that Redfearn stated he had sold multiple licenses, including licenses in Washington and other states where there were no such licenses, and that he told Brent that other licensees had been successful, when at the time he made those statements no licensees anywhere had made any money so far. The Kays testified that their manufacturing facility was not operational until after the lawsuit was filed, and that they made no product there until well after the dates the statements were made. And Redfearn himself testified that he told the St. Louis Health Department that the product did not comply with governmental regulations and should not be sold to the public. The FDA concluded that the product had not been manufactured according to the appropriate licensing requirements. The jury had ample evidence on which to conclude that Redfearn had defrauded Brent.

The breach of contract verdict was also not against the weight of the evidence. As discussed above, there were multiple copies of multiple contracts presented into evidence, and the jury heard all the parties' explanations about them. Some of those explanations support the conclusion that Redfearn breached the

contracts, and the jury was entitled to credit that testimony.  Redfearn's argument that the last contract voided all the others and then later became void itself relies on an incorrect interpretation of contract law and the facts here.  The handwritten notation that the contract would be null and void if certain things did not happen was a condition precedent to the contract formation.  See Adams v. Suozzi, 433 F.3d 220, 227 (2nd Cir. 2005); Vendig v. Traylor, 604 S.W.2d 424 (Tex. App. 1980).  Redfearn cannot pick out some provisions of the contract that he wishes to enforce and say that they are valid while claiming that other provisions never came into effect.  Additionally, his own actions taken after the signing of the last contract contradict his arguments about whether the contracts were still in existence.

The tortious interference and defamation counts are probably the easiest to deal with.  Redfearn knew that Brent had obtained the supermarket placements and thus that Brent had a valid business expectancy in making sales to the supermarkets.  The credible evidence showed that Redfearn knew his statements to the health department were false and that he had no justification for his actions in calling the health department.  His testimony about this phone call was probably the least credible of all his testimony, and the jury could certainly conclude that he made the phone call with the express intent of putting Brent out of business.  The evidence fully supported an inference that he did so maliciously, because he was angry that

Brent had refused to send more money to enter into yet another contract.

Finally, I have a duty to review the amount of the punitive damages award to determine if it violates due process. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003); BMW v. Gore, 517 U.S. 559 (1996). In Gore, and later in State Farm, the Supreme Court outlined three guideposts that courts should consider in determining whether a punitive damages award is unconstitutionally excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Gore, 517 U.S. at 575; State Farm, 538 U.S. at 418. The punitive damage award of $500,000 is not excessive. Redfearn's conduct was clearly malicious, the punitive award is only five times the actual damage award for defamation, and the award is not out of line for those made in similar cases in Missouri, as the cases cited in Brent's briefs show.

## Attorneys Fees and Bill of Costs

Brent has filed a motion for attorneys fees and a bill of costs. Redfearn has not objected to these requests and his time for doing so has passed. As agreed to by both counsel at trial, Texas law provides for recovery of attorneys fees to the

prevailing party in a breach of contract case. Tex. Stat. 54 § 8.02. Brent prevailed both on his own breach of contract claim and on Redfearn's breach of contract counterclaim. The amounts of the requested attorneys fees are reasonable, and the costs sought to be taxed are those properly taxable under 28 U.S.C. §1920. I will therefore grant both requests.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for new trial [#75] is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion for attorneys fees [#78] and motion for bill of costs [#79] are granted. Plaintiffs shall recover of defendant Jerry Redfearn their attorneys fees in the amount of $74,037.25. The Clerk of Court shall tax as costs to be borne by defendant costs in the amount of $4070.84 as listed on plaintiff's bill of costs.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of March, 2006.